# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE DIVISION

| | | |
|---|---|---|
| **JOSEPH PERVIS HEBERT** | * | **CIVIL ACTION NO. 13-3142** |
| **VERSUS** | * | **JUDGE DOHERTY** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

    This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Joseph Pervis Hebert, born September 1, 1960, filed applications for a period of disability, disability insurance benefits and supplemental security income on March 3, 2011 and March 25, 2011, respectively, alleging disability as of March 14, 2011, due to neck pain, fibromyalgia, osteoarthritis, osteophytes on his spine, several disc bulges, heart disease, memory loss from a previous stroke, atherosclerosis, and chronic obstructive pulmonary disease.

## FINDINGS AND CONCLUSIONS

    After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's finding that the claimant

was not disabled.  However, I recommend that this matter be remanded for further administrative action, based on the following:[1]

**(1) Records from Miscellaneous Doctors dated February 3, 2009 to April 19, 2010**.  On April 18, 2010, Dr. Eduardo Gonzalez-Toledo performed a CT of the lumbar spine, which showed degenerative changes in the lumbar spine and atherosclerosis.  (Tr. 211).  Cervical spine views showed a wire fixation of the spinous processes of C1 to C3 with wires that were broken; anterolisthesis and degenerative change at C2-C3, and other multilevel degenerative changes.  (Tr. 212).

**(2) Records from WK Bossier Health Center dated June 2-3, 2010**.  Claimant was admitted with complaints of headache and stiff neck for two weeks.  (Tr. 217).  A CT of the cervical spine showed degenerative changes in the lower cervical spine.  (Tr. 226).  The impression was acute headache and established hypertension.  (Tr. 225).  He was prescribed Percocet, Zofran, and Toradol.

**(3) Records from LSU Health Sciences Center Shreveport dated March 4, 2010 to August 30, 2010**.  On March 4, 2010, claimant complained of hypertension, arthritis and headaches.  (Tr. 278).  He reported pain in his hands,

---

[1]Although all of the medical records were reviewed by the undersigned, only those related to the arguments raised in the brief are summarized herein.

neck, lower back and left knee, and swelling in his hands.  On examination, he had some weakness in his grip.  (Tr. 279).  The assessment was questionable rheumatoid arthritis, hypertension, and episodic alcohol abuse.  (Tr. 279-80).  He was prescribed Lisinopril-Hydrochlorothiazide, Tramadol, and Celebrex.  (Tr. 279).

On April 18, 2010, claimant presented with low back and right groin pain after being thrown from a horse and being pinned between the horse and a wall.  (Tr. 247).  His diagnosis was lumbago and hernia.  (Tr. 248).  He was prescribed Flexeril and Ibuprofen.

Claimant returned on July 15, 2010, with complaints of chronic low back pain and pain in his hands.  (Tr. 251-53).  On examination, he had decreased range of motion in the cervical spine.  (Tr. 253).  The assessment was DJD and arthralgias, for which he was prescribed Naproxen and Tylenol.  (Tr. 252).

**(4) Records from WK Haughton Medical Group and LSU Health dated June 7, 2010 to March 30, 2011**.  On June 7, 2010, claimant complained of neck and back pain and headaches.  (Tr. 312).  He was prescribed Lisinopril HCT, Relafen and Flexeril.

On June 21, 2010, claimant complained that he had extreme pain in his head.  (Tr. 311).  The assessment was hypertension, headaches, and neck and back

pain.  He was prescribed Lortab and Neurontin.

On August 2, 2010, claimant complained of chronic headaches, neck, back, and chest wall pain.  (Tr. 290).  On examination, he had lower back paraspinal muscle tenderness to palpation, stiff range of motion of the LS spine, and tight straight leg raising.  (Tr. 291).  Dr. B. Scott Harrington's impression was chronic headaches; chronic neck, back and left chest wall pain; abnormal stress test, and hypertension.  He was prescribed Methadone, Neurontin, and Lortab.

On August 25, 2010, claimant complained that his low back pain was a "7."  (Tr. 308).  His Methadone and Neurontin were increased.

On September 22, 2010, claimant presented with chronic back pain.  (Tr. 287).  His back examination was the same.  (Tr. 288).  Dr. Harrington's impression was chronic back pain, for which he prescribed Methadone, Neurontin, and Lortab.  He advised claimant to reconsider getting back into pain management.

**(5) Records from Interim LSU Public Hospital dated January 24, 2011 to April 6, 2011**.  Lumbosacral spine x-rays dated March 29, 2011, showed chronic degenerative changes.  (Tr. 325).  Cervical spine views showed an old injury with repairs and chronic spondylosis, negative acute.  (Tr. 326).  Thoracic spine x-rays showed osteopenia and degenerative changes.  (Tr. 327).  Pelvic/sacroiliac joint views showed no gross abnormality.  (Tr. 328-29).

On April 6, 2011, claimant complained of back pain since July, 2010, which radiated down to his right leg and knee at times. (Tr. 322). Additionally, he reported bilateral hand numbness at times and locking. He had been falling secondary to weakness, and had trouble opening things. Flexeril did not provide any relief.

On back examination, claimant was tender to palpation over the C-spine and T-spine, and had some SI joint tenderness on the right. (Tr. 323). He had decreased range of motion in the neck. He had some paraspinal muscle tenderness in the thoracic region as well as the lumbar region.

Neurologically, claimant had decreased sensation over his left upper extremity, 2+ biceps and patellar reflexes bilaterally, and downgoing Babinski bilaterally. Strength in the upper and lower extremities was normal.

Dr. Jared Rochelle ordered an EMG and nerve conduction studies to rule out cervical radiculopathy and increased claimant's dosage for Amitriptyline and continued Flexeril.

**(6) Consultative Examination by Dr. Kenneth A. Ritter dated August 12, 2011**. Claimant complained of fibromyalgia, osteoarthritis, non-obstructive coronary artery disease, two prior strokes with subsequent memory loss, chronic obstructive lung disease with ongoing heavy cigarette smoking, and post-surgical

neck pain with stiffness and headaches. (Tr. 334). His medications included Amitriptyline, Lisinopril, Nexium, Lipitor, Aspirin, Dicolfenac, and Robaxin.

On examination, claimant was very anxious. (Tr. 335). His blood pressure was 168/94. Range of motion of his neck was decreased about 50%.

On extremities examination, claimant ambulated with a slight limp favoring the left leg. He had negative straight-leg raises bilaterally. (Tr. 336). Neurologically, he was intact with normal DTRs, strength and sensation.

Pulmonary function study revealed a normal spirometry. (Tr. 336, 337-40).

Dr. Ritter's impression was osteoarthritis causing neck and spine pain; non-obstructive coronary disease; stroke without residual problems; chronic obstructive pulmonary disease with ongoing cigarette smoking, and hypertension with significantly elevated blood pressure on examination. (Tr. 336).

In the Medical Assessment of Ability to do Work-Related Activities (Physical), Dr. Ritter found that claimant could lift/carry 10 to 25 pounds occasionally and 10 to 20 pounds frequently. (Tr. 341). He could stand/walk for four to eight hours in an eight-hour day, and two to four hours without interruption. Sitting was not affected by his impairments.

Dr. Ritter further found that claimant could occasionally climb, stoop, kneel, crouch and crawl, and frequently balance. His physical functions were not

affected by his impairments.  (Tr. 342).

**(7) Records from UMC dated July 11, 2011 to August 22, 2011**.  A CT of the head dated July 8, 2011, showed a chronic region of encephalomalacia in the inferior left cerebellar hemisphere with no acute intracranial abnormality.  (Tr. 346).  A CT of the cervical spine dated August 17, 2011, revealed status-post fusion of C2-3 with cerclage wired from C1-C3; disc space narrowing most significant at C5-6; reversal of cervical lordosis, posterior disc herniations, and no evidence of acute fracture.  (Tr. 349).

A lumbar MRI dated August 17, 2011, showed degenerative disc disease with central disc protrusions and spondylosis at L3-4 through L5-S1 causing bilateral foraminal narrowing.  (Tr. 347).  A cervical MRI showed degenerative disc disease at C4-5 through C6-7 with some mild to moderate bilateral foraminal narrowing.  (Tr. 348).

**(8) Records from LSU-Shreveport dated February 17, 2012**.  EMG/NCS studies showed moderate abnormality with electrophysiologic evidence for mild chronic median neuropathies at the wrists bilaterally (as can be seen in Carpal Tunnel Syndrome), and a mild chronic right C6 radiculoneuropathy.  (Tr. 351).

**(9) Medical Source Statement by Dr. Lea Potter, UMC, dated June 6, 2012**.  Dr. Potter's diagnosis were DJD with nerve involvement and herniated

discs. (Tr. 356). She cited MRI and CT findings to support this opinion. She found that claimant had significant limitation of motion and severe headache pain associated with impairment of the cervical spine.

Dr. Potter stated that claimant had side effects from medication that may have implications for working, including drowsiness, dizziness, nausea and delayed reaction time. She checked that claimant's impairments lasted or could be expected to last at least twelve months.

Additionally, Dr. Potter checked that claimant's impairments were reasonably consistent with the symptoms and functional limitations described in the evaluation. She checked that claimant's experience of pain would be severe enough to interfere with attention and concentration constantly. She filled in the blank that claimant could walk "0" city blocks without rest or severe pain. (Tr. 357).

Additionally, Dr. Potter circled that claimant could sit and stand for five minutes at one time. She checked that he would sometimes need to take unscheduled breaks during an eight-hour working day. She checked that he could never lift less than 10 pounds. She finally checked that his impairments were not likely to produce "good days" and "bad days."

**(10) Disability Determination Report by Dr. Joseph Michalik dated August 18, 2011**.  Dr. Michalik, a non-examining physician, determined that claimant was limited to lifting/carrying 20 pounds occasionally and 10 pounds frequently; standing and/or walking and sitting about six hours in an eight-hour workday; unlimited as to pushing/pulling; occasionally limited as to climbing ramps/stairs, balancing, stooping, kneeling, crouching and crawling, and could never climb ladders/ropes/scaffolds; had no manipulative, visual, or communicative, and had environmental limitations as to avoiding concentrated exposure to fumes, odors, gases, poor ventilation, etc.  (Tr. 67-68).  He opined that claimant was not disabled.  (Tr. 70).

**(11) Claimant's Administrative Hearing Testimony**.  At the hearing on June 6, 2012, claimant was 51 years old.  (Tr. 35).  He had an 11th grade education.  (Tr. 37).  He had past relevant work experience as a horse race starter, horse exerciser, and horse trainer.  (Tr. 37-38, 54).  He said that he had stopped working in March, 2011, because of pain.  (Tr. 44).

As to complaints, claimant testified that he had broken the first two vertebrae in his back in 1988, for which he had surgery.  (Tr. 38).  Since then, he had been having a lot of back problems.  (Tr. 38).  He also complained of almost

daily headaches, which lasted for a couple of hours. (Tr. 39). Additionally, he reported weakness and tingling in his arms. (Tr. 39-40).

Claimant testified that he used a heating pad for pain relief. (Tr. 40-41). He usually wore two back braces. (Tr. 43-44). He took about three Lortab per day, which made him really drowsy. (Tr. 44-45)

Claimant testified that he smoked a half of pack a day. (Tr. 41). He said that he drank about two beers a week. (Tr. 42).

Regarding restrictions, claimant testified that he had lifted a 10 to 15 pound load of laundry the day before, but had been having a lot of pain since then. (Tr. 40). He said that he could sit and stand comfortably for about eight or ten minutes. (Tr. 46-47).

Regarding activities, claimant stated that he had not driven in four or five years because of an insurance problem and medications. (Tr. 36). His usual routine in the morning was to take pain medications, drink a couple of cups of coffee, and lie back in bed. (Tr. 42). He said that he did some laundry and cooked about twice a week. (Tr. 43).

Additionally, claimant said that he used the computer on his phone. (Tr. 48). He said that he used to fish a lot, but could not sit up in a boat for that long

anymore. He had a friend who came over and visited with him twice a week. (Tr. 49).

**(12) Administrative Hearing Testimony of Leonard Francois, Vocational Expert ("VE")**. Mr. Francois classified claimant's past work as a horse race starter as semiskilled and light; a horse exerciser as semiskilled and medium, and a horse trainer as skilled and medium. (Tr. 54). The ALJ asked the VE to assume a claimant of the same age, education, and work experience; who could lift and carry 20 pounds occasionally and 10 pounds frequently; stand, walk and sit for about six hours a day; could not do constant, but could do frequent fingering; could not be exposed to concentrated pulmonary irritants, and could not do complex work. (Tr. 54-55). In response, Mr. Francois testified that such claimant could work a marker, of which there were 2,753 jobs statewide and 210,584 and 210,584 nationally, and information clerk, of which there were 1,205 jobs statewide and 82,237 nationally. (Tr. 55).

When the VE changed the hypothetical to assume a claimant who could sit for only eight minutes at a time and stand for only eight to 10 minutes due to pain, the VE testified that the claimant could not do those jobs. Additionally, when the ALJ added episodic headaches which would cause claimant to miss four days of

work per month, the VE testified that such claimant could not do these or any other jobs on a sustained basis.

**(13) The ALJ's Findings**.  Claimant argues that: (1) the ALJ failed to assign controlling weight to the treating source medical opinion of Dr. Lea Potter in contravention of controlling law; (2) the ALJ failed to weigh the medical opinion evidence in accordance with controlling law; (3) the ALJ failed to find cervical radiculopathy was a severe impairment at step two of the sequential evaluation process; (4) the ALJ failed to account for the side effects of claimant's medications in assessing his residual functional capacity ("RFC"), and (5) the ALJ misstated the evidence and thus his credibility determination and RFC assessment are not supported by substantial evidence.  Because I find that the ALJ failed to properly evaluate the opinions of claimant's treating physician and the side effects from his medications, I recommend that this case be **REMANDED** for further proceedings.

Regarding the first two arguments, it is well established that the opinion of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability.  *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *Greenspan v. Shalala*, 38 F.3d 232, 237

(5th Cir. 1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995).

A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence." *Newton*, 209 F.3d at 455.

Good cause for abandoning the treating physician rule includes disregarding statements by the treating physician that are brief and conclusory, not supported by medically accepted clinical laboratory diagnostic techniques, or otherwise unsupported by evidence. *Id.* at 456; *Greenspan*, 38 F.3d at 237.

Here, claimant argues that the ALJ erred in failing to properly evaluate Dr. Potter's treating source opinion in accordance with 20 C.F.R. §§ 404.1527(c) and 416.927(c), and *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001); in giving significant weight to a non-examining physician, Dr. Michalik, and in failing to assign any weight to the opinions of the consultative examiner, Dr. Ritter. [rec. doc. 10, p. 9].

The ALJ found that Dr. Potter's assessment was "not supported by the medical evidence as a whole." (Tr. 19). However, although Dr. Potter used a summary checklist, she did list the tests upon which she had relied for her opinion,

13

including the lumbar MRI from August 17, 2011, showing degenerative disc disease with central disc protrusions and spondylosis at L3-L4 causing bilateral foraminal narrowing; the cervical MRI from August 17, 2011, showing DJD at C4-5 through C6-7 with foraminal narrowing and disc bulging, and the cervical spine CT showing multiple disc herniations. (Tr. 347-49, 356). The MRIs were taken after Dr. Ritter's report was issued on August 12, 2011. (Tr. 334).

In *Myers*, the Fifth Circuit held that an ALJ must consider the following factors before declining to give any weight to the opinions of a treating doctor: length of treatment, frequency of examination, nature and extent of relationship, support provided by other evidence, consistency of opinion with record, and specialization. *Id*. at 621 (*citing Newton,* 209 F.3d at 456).

The Commissioner argues that the ALJ considered these factors in his determination. [rec. doc. 11, p. 7]. However, a review of the record indicates that while the ALJ mentioned Dr. Potter's statement in his decision, he did not consider most of the *Myers* factors. (Tr. 18-19). As noted in Myers, "[T]his is a case where the ALJ summarily rejected the opinions of [Myers's] treating physician, based only on the testimony of a non-specialty medical expert [Dr. Michalik] who had not examined the claimant." *Id*. at 621 (quoting *Newton,* 209 F.3d at 458). The undersigned finds that this constitutes error.

Additionally, claimant asserts that the ALJ failed to consider the side effects from his medications. The ALJ noted that claimant had testified at the hearing that he took prescription pain medication, which gave him short-term relief but caused drowsiness. (Tr. 14). While the ALJ acknowledged that claimant was taking medication, the ALJ failed to properly consider any side effects from those medications on his ability to work.

The record reflects that claimant was taking Methadone, Percocet, Darvocet, Lortab Neurontin, and Flexeril. (Tr. 203, 286, 288, 291, 293-94, 307-08). Several of these are narcotic medicines designed for the relief of moderate-to-severe pain. As Dr. Potter noted, these medications cause side effects of drowsiness, dizziness, nausea and delayed reaction time, all of which might have implications for working. (Tr. 356).

Under the regulations, the Commissioner is required to consider the "type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [] pain or other symptoms." *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999) (citing 20 C.F.R. § 404.1529(c)(3)(iv)). The ALJ did not take the side effects of claimant's medications into consideration, and his failure to do so was error. *See J.F.B. v. U.S. Com'r, Soc. Sec. Admin*., 2013 WL 1152722, at *2 (W.D. La. Feb. 4, 2013) (Hornsby, J), *report and recommendation adopted*,

2013 WL 1152747 (W.D. La. Mar. 19, 2013) ("The absence of a direct discussion of a claim of drowsiness or other side effect, which could be a significant nonexertional impairment, may deprive the agency decision of substantial evidence to support it and preclude an informed appellate review.").

Accordingly, the undersigned recommends that this case be **REMANDED** to the Commissioner for further administrative action pursuant to the fourth sentence of 42 U.S.C. § 405(g).  This includes, but does not limit, sending the case to the hearing level with instructions to the Administrative Law Judge to evaluate the opinions of claimant's treating physician under *Myers v. Apfel*, 238 F.3d 617 (5th Cir. 2001); to consider the side effects of his medications, and to obtain an updated residual functional capacity assessment.  Claimant shall be afforded the opportunity to submit additional evidence and to testify at a supplemental hearing.

Inasmuch as the remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).  See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992) and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from

service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed March 26, 2015 at Lafayette, Louisiana.

_____
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE